A. NICOLE HALLETT (*pro hac vice*)
nhallett@uchicago.edu
EDWIN F. MANDEL LEGAL AID
CLINIC
The University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637
Tel: (203) 910-1980
Fax: (773) 702-2063

ERIKA PINHEIRO (CA BAR NO. 275711)
erika@alotrolado.org
AL OTRO LADO
PO BOX 32578
Los Angeles, CA 90032
Tel: (619) 786-4866
Fax: (323) 430-8793

Attorneys for Plaintiffs
AL OTRO LADO and
EDWIN F. MANDEL LEGAL AID CLINIC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

AL OTRO LADO and EDWIN F.
MANDEL LEGAL AID CLINIC
     Plaintiffs,

    vs.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, UNITED
STATES CUSTOMS AND BORDER
PROTECTION, and UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT,
    Defendants.

Case No.: CV 20-05191-ODW(MRWx)

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking the expedited processing and release of agency records relating to the Defendants' response to the COVID-19 outbreak at immigration detention facilities, land ports of entry, and Border Patrol stations in Southern California. Al Otro Lado ("AOL") and the Edwin F. Mandel Legal Aid Clinic at the University of Chicago Law School ("Mandel Clinic") (together, "Plaintiffs") submitted three identical FOIA requests on May 5, 2020 to the U.S. Department of Homeland Security ("DHS" or the "Department") and two of its component agencies, U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE"), seeking records about their response to the COVID-19 pandemic at certain immigration detention facilities. Plaintiffs requested that the Defendants process the May 5, 2020 FOIA requests on an expedited basis because of the imminent threat that COVID-19 posed to immigrant detainees and the intense public interest in Defendants' response to the pandemic. Two days after Plaintiffs submitted their FOIA requests, an immigrant detainee died of COVID-19 after having been held at the Otay Mesa Detention Center in San Diego – one of

1   the facilities about which Plaintiffs' FOIA requests sought records, and indeed the

2   first ICE facility to record an immigrant death from COVID-19.[1]

3       DHS acknowledged that the requested information was entitled to expedited

4   processing, and on May 8, 2020, the Department notified Plaintiffs that it was

5   granting their request for such treatment and coordinating a unified response with

6   Defendants CBP and ICE. However, in violation of the FOIA and the

7   Department's own regulations, Defendants have failed to process Plaintiffs' FOIA

8   requests within the statutory time frame of 20 working days from the requests'

9   receipt – which also applies to ordinary FOIA requests that have not been granted

10  expedited treatment.

11      The Department's failure to process Plaintiffs' FOIA requests is unlawful.

12  Meanwhile, immigrants detained in Defendants' custody continue to be at grave

13  risk of becoming infected with COVID-19, its attendant health complications, and

14  death. Plaintiffs respectfully request that the Court enter an order compelling the

15  Defendants to disclose the requested records within 30 days.

16                          **STATEMENT OF FACTS**

17  **I.  The COVID-19 Outbreak in the United States and its Outsized Impact**
       **on Immigration Detention Facilities.**

18

19  _____

[1] Kate Morrissey, THE SAN DIEGO UNION TRIBUNE, *First ICE detainee dies from COVID-19 after being hospitalized from Otay Mesa Detention Center* (May 6, 2020),
20  https://www.sandiegouniontribune.com/news/immigration/story/2020-05-06/first-ice-detainee-dies-from-covid-19-after-being-hospitalized-from-otay-mesa-detention-center.

21

1    In the months since the first detected case of COVID-19 in the United

2  States, over 2.6 million people have been infected with the disease and over

3  128,000 people have died from it.[2] Despite the social distancing measures that

4  federal, state, and local governments have implemented to reduce the spread of

5  COVID-19, unprecedented waves of infections have overwhelmed national

6  stockpiles of medical resources and protective equipment.[3] Detained individuals

7  are uniquely vulnerable to COVID-19.

8    For months, experts have warned that immigration detention centers are

9  "primed for uncontrolled coronavirus transmission" and that they amount to "a

10  public health disaster in the making."[4] Many of the problems that immigrant

11  detainees faced in DHS custody before the COVID-19 outbreak – such as denial of

12  access to adequate medical care, poor sanitation, a lack of hygiene supplies, and

13  outbreaks of other infectious diseases – have only been aggravated by the

14  pandemic.[5] Coupled with the fact that many immigrant detainees suffer from

15  preexisting conditions or comorbidities that place them at an even greater risk of

16

17  [2] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in the US* (Jun. 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

18  [3] *See, e.g.*, Melanie Evans, WALL STREET JOURNAL, *US Strategic Stockpile of Medical Supplies Is Outmatched by Coronavirus* (Mar. 23, 2020), https://www.wsj.com/articles/u-s-strategic-stockpile-of-medical-supplies-is-outmatched-by-coronavirus-11584990542.

19  [4] Jackie Powder, JOHNS HOPKINS BLOOMBERG SCHOOL OF PUBLIC HEALTH: COVID-19 – SCHOOL OF PUBLIC HEALTH EXPERT INSIGHTS, *Detained and Vulnerable to COVID-19* (Apr. 3, 2020), https://www.jhsph.edu/covid-19/articles/detained-and-vulnerable-to-covid-19.html.

20  [5] Eunice Cho, ACLU, *Immigration Detention Was a Black Box Before COVID-19. Now, It's a Death Trap.* (Apr. 30, 2020), https://www.aclu.org/news/immigrants-rights/immigration-detention-was-a-black-box-before-covid-19-now-its-a-death-trap/.

21

8

Memorandum of Points and Authorities

1   contracting COVID-19 and suffering life threatening or fatal health consequences,

2   the agency's failure to furnish the requested records is all the more egregious.[6]

3      Even the employees at ICE detention facilities have identified problems that

4   place detainees at a higher risk of contracting COVID-19. The Office of the

5   Inspector General ("OIG") for DHS recently released a report detailing survey

6   responses it collected from personnel at ICE detention facilities around the country

7   from April 8 to April 20, 2020. In the responses to these surveys, facility

8   employees reported an "inability to practice social distancing among detainees, and

9   to isolate or quarantine individuals who may be infected with COVID-19."

10  Furthermore, while most facility employees reported that they were prepared to

11  address the virus, they also expressed doubts about their ability to address future

12  problems "if the pandemic continued to spread." Within four weeks after OIG

13  conducted those surveys, the number of detainees who tested positive for COVID-

14  19 had nearly quintupled, and the number has only grown since then.[7]

15     As medical experts predicted, COVID-19 has spread through detention

16  centers across the country. Over 2,700 cases have been confirmed among ICE

17  detainees, along with at least 45 confirmed cases among ICE employees at

18

19  [6] *See* Shannon Dooling, WBUR, *'They Fear That They're Going To Die Here'; ICE Detainees in Bristol County Speak Out on COVID-19 Concerns* (Mar. 24, 2020), https://www.wbur.org/news/2020/03/24/bristol-county-detainees-immigration-ice-covid-19-coronavirus; Centers for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness* (Apr. 15, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

20  [7] Dep't of Homeland Sec. Office of the Inspector Gen., *Early Experiences with COVID-19 at ICE Detention Facilities* 6 (Jun. 18, 2020), https://www.oig.dhs.gov/sites/default/files/assets/2020-06/OIG-20-42-Jun20.pdf.

21

1  detention centers.[8] However, the risks presented by COVID-19 are not limited to

2  immigration detention facilities, nor are they solely of concern to immigrant

3  detainees. As of June 30, 2020, 899 CBP employees nationwide – including 156 in

4  California – had tested positive for COVID-19.[9]

5      The reported number of cases may not reflect the true scope of the outbreak

6  in detention centers due to a lack of testing. As of June 4, ICE reported 1,623

7  positive cases after testing 3,146 detainees With an over 50% positive test rate, no

8  state has come close to matching ICE's positive test rate. The Center for American

9  Progress suggested that such a high infection rate may be explained by testing only

10 symptomatic individuals or due to the conditions in the detention centers. The

11 numbers also are not necessarily accurate given the over "58,000 people [who]

12 have passed through ICE's detention system since the first detained person was

13 confirmed to have the coronavirus. It is impossible to say what percentage of

14 individuals detained today have been tested."[10] One study estimated that the

15 number of people infected with COVID-19 in ICE detention may be 15 times

16 higher than the official numbers suggest.[11]

17

18 [8] U.S. Immigration and Customs Enforcement, *ICE Guidance on COVID-19* (Jun. 4, 2020), https://www.ice.gov/coronavirus.
   [9] U.S. Customs and Border Protection, *CBP COVID-19 Updates and Announcements* (Jun. 4, 2020), https://www.cbp.gov/newsroom/coronavirus#.

19 [10] Tom Jawetz and Nicole Prchal Svajlenka, CENTER FOR AMERICAN PROGRESS, *Data on the Coronavirus Outbreak in Immigration Detention Offer More Questions than Answers* (Jun. 16, 2020), https://www.americanprogress.org/issues/immigration/news/2020/06/16/486338/data-coronavirus-outbreak-

20 immigration-detention-offer-questions-answers/.
   [11] Nina Sulic, VERA INSTITUTE OF JUSTICE, *Vera's New Prevalence Model Suggests COVID-19 is Spreading*

21 *through ICE Detention at Much Higher Rates than Publicized* (Jun. 4, 2020) https://www.vera.org/blog/covid-

1    Defendants have been slow to react to the threat posed by COVID-19, and in

2    some instances, their actions have actually put immigrant detainees at an even

3    greater risk of infection.[12] Even though there have been some medically vulnerable

4    detainees who have been released from DHS custody, the vast majority remain

5    detained.[13] For those who remain in Defendants' custody, the situation is dire.

6    Numerous media outlets have reported that staff at the Otay Mesa, Adelanto, and

7    other immigration detention facilities have subjected immigrant detainees to

8    violent retaliation and confinement after the detainees peacefully protested against

9    their living conditions or insisted upon being provided with personal protection

10   equipment ("PPE") in order to avoid contracting COVID-19 in facilities where it is

11   impossible to socially distance.[14] Information about conditions in immigration

---

19-1/veras-new-prevalence-model-suggests-covid-19-is-spreading-through-ice-detention-at-much-higher-rates-than-publicized.

[12] Fernanda Echavarri and Noah Lanard, MOTHER JONES, *A Doctor on ICE's Response to the COVID-19 Pandemic: "You Could Call It COVID-19 Torture* (Apr. 13, 2020), https://www.motherjones.com/politics/2020/04/a-doctor-on-ices-response-to-the-pandemic-you-could-call-it-covid-19-torture/; Bryn Stole and Matt Sledge, NOLA, *Coronavirus Cases Explode in Louisiana's Immigration Lock-ups; What Is ICE Doing about It?* (May 2, 2020), https://www.nola.com/news/coronavirus/article_ae470c36-8c9f-11ea-8450-af1b6c53da5c.html.

[13] Kristina Davis, LOS ANGELES TIMES, *Judge Declines to Order Release of More Medically Vulnerable ICE Detainees* (May 29, 2020), https://www.latimes.com/california/story/2020-05-29/preliminary-injunction-ice-detainees.

[14] Noah Lanard, MOTHER JONES, *ICE Detainees Terrified of the Coronavirus Wanted to Be Deported. Guards Pepper-Sprayed Them* (Apr. 23, 2020), https://www.motherjones.com/politics/2020/04/ice-detainees-terrified-of-the-coronavirus-wanted-to-be-deported-guards-pepper-sprayed-them/; Debbie Nathan, THE INTERCEPT, *Women in ICE Detention Face Reprisals for Speaking Up about Fears of COVID-19* (Apr. 28, 2020), https://theintercept.com/2020/04/28/ice-detention-coronavirus-videos/; Cho, *supra* note 3 (solitary confinement used to punish Louisiana detainee who spoke with journalist about facility conditions); José Olivares, THE INTERCEPT, *ICE's Immigration Detainees Protested Lack of Coronavirus Precautions — and SWAT-like Private-Prison Guards Pepper-Sprayed Them* (May 5, 2020), https://theintercept.com/2020/05/05/ice-stewart-immigration-detention-coronavirus-protest-pepper-spray/; Shannon Dooling, WBUR, *ICE Detainees Allege Assault, Isolation Used As Retaliation at Bristol County; Sheriff Denies Claims* (May 6, 2020), https://www.wbur.org/news/2020/05/06/bristol-sheriff-hodgson-altercation-recording (Massachusetts detainees allege assault and use of tear gas, paper spray, K9 unit, and solitary confinement against detainees seeking better detention center response to COVID-19); Andrea Castillo, LOS ANGELES TIMES, *Immigrants detained at Adelanto staged a peaceful protest. Guards in riot gear pepper-sprayed them* (Jun. 26, 2020), https://www.latimes.com/california/story/2020-06-26/immigrants-detained-at-

---

Memorandum of Points and Authorities

1  detention centers is urgently needed to allow the media and the general public to

2  understand the extent and nature of the COVID-19 crisis in those facilities, but it is

3  equally important for policymakers to be in full possession of any relevant facts

4  when making choices that can affect the lives of thousands of immigrant detainees,

5  detention center staff members, the communities to which formerly detained

6  immigrants are released, and the communities in which detention facility staff

7  reside.

8  **II. Plaintiffs' FOIA Requests and Request for Expedited Processing.**

9       On May 5, 2020, Plaintiffs submitted identical letters to Defendants DHS,

10  CBP, and ICE seeking records in the agencies' possession relating to the COVID-

11  19 outbreak at the Adelanto Detention Center, Otay Mesa Detention Center, and all

12  land ports of entry and Border Patrol stations in California under the FOIA. The

13  records requested included, but were not limited to:

14     i.  Medical files, with names and other personal identifying information
           redacted, of detainees who have reported respiratory or flu-like symptoms,
15         or who have been tested for or diagnosed with COVID-19 from February 1,
           2020 to present.
16    ii.  Records related to precautions taken at the facilities because of the COVID-
           19 pandemic.
17   iii.  Records containing the number of detainees who have been taken to the
           hospital, tested positive for COVID-19, been placed in solitary confinement,
18         or granted parole from February 1, 2020 to present.

19  adelanto-staged-a-peaceful-protest-guards-in-riot-gear-pepper-sprayed-them; Kate Morrisey, THE SAN DIEGO UNION
    TRIBUNE, *As Coronavirus spreads in federal detention center, calls for widescale release grow* (Apr. 12, 2020),
20  https://www.sandiegouniontribune.com/news/immigration/story/2020-04-12/coronavirus-spread-in-otay-mesa-
    detention-center.

21

Memorandum of Points and Authorities

iv. Records regarding the management of hunger strikes within the facilities.

v. Policies and communications related to private contractors and COVID-19.

vi. Records relating to detainee housing transfers in Otay Mesa from April 10, 2020 to present.

*See* Plaintiffs' FOIA Request, attached as Exhibit 1. In the May 5 letters, Plaintiffs requested that the FOIA requests be processed on an expedited basis under 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e)(1). Plaintiffs also requested a fee waiver under 5 U.S.C. § 552(a)(4)(A) and 6 C.F.R. § 5.11(k). In their request for expedited processing, Plaintiffs noted 1) that any delay in disclosing the requested information "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(e)(1)(i); 5 U.S.C. § 552(a)(6)(E)(v)(I), and 2) that the request sought records on "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv).

### III. Defendants' Response to Plaintiffs' Request for Expedited Processing and Failure to Comply with Plaintiffs' FOIA Requests Within the Statutory Period.

In a letter dated and received May 8, 2020, DHS acknowledged receipt of Plaintiffs' FOIA request on May 6, 2020 and assigned it reference number 2020-HQFO-01067. *See* DHS Acknowledgement, attached as Exhibit 2. DHS informed Plaintiffs that the Department's Privacy Office would coordinate a search with

CBP and ICE and respond to the FOIA request on behalf of DHS and its components. *Id.* In the letter, DHS granted Plaintiffs' request for expedited processing of the FOIA request and also conditionally granted Plaintiffs' request for a fee waiver. The letter further stated that Plaintiffs' request would be responded to "as expeditiously as possible."

Despite Defendants' representations, neither DHS nor any of its component agencies have completed processing the May 5 FOIA requests, nor have they made a determination about whether they will even comply with Plaintiffs' requests within the 20-working day statutory deadline prescribed by statute for regular, non-expedited requests. *See* 5 U.S.C. § 552(a)(6)(A). While Defendants have made multiple representations about when they expect to make the required determination, each of these dates have come and gone without a determination being made. *See* Declaration of A. Nicole Hallett, ¶¶ 5–8 ("Hallett Decl."), attached as Exhibit 3. Moreover, Defendants have provided no estimate on how long it will take them to process and produce the records after the determination is made. *Id.* ¶ 9. Efforts to contact DHS to obtain more information have been unsuccessful. *Id.* ¶¶ 10–11.

## ARGUMENT

### I.  This Court has Jurisdiction to Grant the Requested Relief.

1    Under the FOIA, this Court has jurisdiction to hear this matter and grant any

2    appropriate injunctive relief:

3        On complaint, the district court of the United States in the district in
         which the complainant resides, or has his principal place of business .
4        . . has jurisdiction to enjoin the agency from withholding agency
         records and to order the production of any agency records improperly
5        withheld from the complainant. In such a case the court shall
         determine the matter de novo.
6

7    5 U.S.C. § 552(a)(4)(B). *See Al-Fayed v. CIA*, 254 F.3d 300, 305 (D.C. Cir. 2001).

8    Despite Defendants' decision to "expedite" Plaintiffs' FOIA requests, they have

9    failed to comply with their statutory obligation to process the requests and make a

10   determination about whether they will comply within 20 working days of receipt.

11   *See* 5 U.S.C. § 552(a)(6)(A).

12       When an agency fails to respond to a FOIA request within the timeframe

13   prescribed by law, as Defendants have, a requester "shall be deemed to have

14   exhausted his administrative remedies with respect to such request." 5 U.S.C. §

15   552(a)(6)(C). As a result, Plaintiffs' claim is ripe for adjudication, and they are

16   entitled to seek relief from this Court. *See Citizens for Responsibility & Ethics in*

17   *Washington v. Fed. Election Comm'n*, F.3d 180, 182 (D.C. Cir. 2013) ("*CREW*").

18   The Court may supervise the progress of Defendants' compliance with the FOIA

19   requests and ensure that they exercise due diligence in processing them. *Id*. at 189.

20   FOIA vests "expansive equitable authority" in district courts that authorizes them

21

Memorandum of Points and Authorities

to grant the relief sought by Plaintiffs. *Animal Legal Defense Fund v. U.S. Dep't of Agriculture*, 935 F.3d 858, 869 (9th Cir. 2019).

**II. Plaintiffs are Entitled to a Preliminary Injunction.**

A court can grant a preliminary injunction if a plaintiff establishes the existence of four factors: "(1) [a] likelihood of success on the merits; (2) [a] likelihood of suffering irreparable harm absent a preliminary injunction; (3) the balance of the equities tips in the plaintiff's favor; and (4) [that] injunctive relief is in the public interest." *Leigh v, Salazar*, 677 F.3d 892 (9th Cir. 2012) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d. 249 (2008)). Although a plaintiff needs to make a showing on all four prongs, *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011), the Ninth Circuit employs a "sliding scale" approach where each element of the four-factor test is balanced "so that a stronger showing of one element may offset a weaker showing of another." *Id.* at 1131. A plaintiff can also obtain a preliminary injunction through a showing that "serious questions go[] to the merits" of its claims and that the balance of hardships tips "sharply" in the plaintiff's favor, so long as it still makes a showing on the two other factors. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018) (quoting *Alliance*, 632 F.3d at 1135).

Memorandum of Points and Authorities

1    Although preliminary injunctions are not frequently invoked as an

2    enforcement mechanism in FOIA cases, they have been deemed appropriate in

3    cases where, as here, the requestor was entitled to expedited FOIA processing and

4    the government failed to process them within the prescribed statutory timeframe.

5    *See Elec. Frontier Foundation v. Office of the Director of Nat'l. Intelligence*, 542

6    F. Supp. 2d 1181, 1185 (N.D. Cal. 2008) (citations omitted); *Elec. Privacy*

7    *Information Center v. Dep't of Justice*, 416 F. Supp. 2d 30, 35 (collecting cases).

8    In this matter, all four *Winter* factors weigh strongly in favor of the issuance of a

9    preliminary injunction.

10    **A. Plaintiffs are Likely to Succeed on the Merits.**

11    In view of the applicable law and the facts of this case, Plaintiffs are likely

12    to prevail on their claims. It is uncontested that Plaintiffs' FOIA requests are

13    entitled to expedited processing. As a result, Defendants must process those

14    requests "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii); 6 C.F.R. § 5.5(e)(4).

15    Defendants have acknowledged the urgency of Plaintiffs' requests and purported to

16    have started searching for responsive records. However, 46 working days have

17    come and gone since Plaintiffs submitted their requests, and Defendants have not

18    met their statutory obligation under 5 U.S.C. § 552(a)(6)(A)(i). An agency's failure

19    to respond to an expedited FOIA request in a timely manner entitles a requester to

20    "immediate judicial supervision" of the agency's response to the FOIA request.

21

Memorandum of Points and Authorities

1   *Protect Democracy Project, Inc. v. U.S. Dep't of Justice*, 263 F. Supp. 3d 293, 302

2   (quoting *Daily Caller v. U.S. Dep't of State*, 152 F. Supp. 3d 1, 10 (D.D.C. 2015)).

3   Although a presumption of unlawful agency delay is rebuttable "if the agency

4   presents credible evidence that disclosure within [the statutory time period] is truly

5   not practicable," *Electronic Privacy Information Center v. Dep't of Justice*, 15 F.

6   Supp. 3d 32, 42 (citations omitted), the Defendants have proffered no such

7   evidence in this matter.

8          Under normal circumstances, FOIA requires agencies to make a

9   "determination" about their response to a FOIA request within 20 working days. 5

10  U.S.C. § 552(a)(6)(A)(i). A determination requires an agency to, at a minimum,

11  "(i) gather and review the documents; (ii) determine and communicate the scope of

12  the documents it intends to produce and withhold and the reasons for withholding

13  any documents; and (iii) inform the requester that it can appeal whatever portion of

14  the 'determination' is adverse." *CREW*, 711 F.3d at 188. Once a determination is

15  made, the agency must process and produce those records "promptly." *Id*. at 188-

16  89. In the context of a request of this scope, that means "within days or a few

17  weeks of a 'determination,' not months or years." *Electronic Privacy Information*

18  *Center*, 15 F. Supp. 3d at 40-41 (quoting *CREW*, 711 F.3d at 188-89).

19         In a recent preliminary injunction case concerning COVID-19 and ICE

20  detention centers, the U.S. District Court for the District of Columbia determined

21

Memorandum of Points and Authorities

1   that the plaintiff was likely to succeed on the merits. The plaintiff in that case

2   presented similar facts to those stated here, including that DHS had approved an

3   expedited FOIA request to produce documents concerning immigration detention

4   facilities' response to the COVID-19 pandemic, but DHS had not produced any

5   documents. Applying the *Winter* test, the district court determined that the plaintiff

6   was likely to succeed on the merits "because it has established that it is entitled to

7   the production of records responsive to its request as soon as 'practicable'."

8   *American Immigration Council v. U.S. Dep't of Homeland Security*, No. 20-1196,

9   slip op. at 6 (D.D.C. July 6, 2020). The court stated that the plaintiff had

10   established urgency based on the plaintiff's assertions that the requested

11   information would be used to influence public discourse on ICE's handling of

12   COVID-19 in immigration detention facilities and to guide efforts that directly

13   impact detainees. *Id*. Furthermore, the district court noted that the defendants had

14   "failed to provide even an estimated timeline for processing and production." *Id*.

15   Such similarities between the facts and arguments in the instant case and in

16   *American Immigration Council*, support the same finding of a likelihood to

17   succeed on the merits.

18       Defendants have failed to make any determination with respect to Plaintiffs'

19   FOIA requests. While they have made multiple representations about when

20   Plaintiffs can expect a determination, each of the dates have come and gone

21

19

Memorandum of Points and Authorities

without a determination by Defendants. *See* Hallett Decl., ¶¶ 5–8. Moreover,

Defendants have not provided an estimated timeline for the processing and

production of the records after a determination has been made. *Id*. ¶ 9. Plaintiffs

are entitled to immediate judicial supervision of Defendants' response and an order

requiring their compliance with FOIA and the Department's own rules.

### B. Plaintiffs will Suffer Irreparable Harm in the Absence of the Requested Injunctive Relief.

Given the rapidly changing nature of the COVID-19 pandemic and the

extreme health risks that immigration detainees currently face in ICE and CBP

detention, Plaintiffs will suffer irreparable harm in the absence of injunctive relief.

In responding to an expedited FOIA request, where "time is necessarily of the

essence," courts have recognized that the harm posed by agency delay can be

irreparable. *American Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182, 186

(D.D.C. 2019) (citing *Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice*, 416 F. Supp.

2d 30, 40-41 (D.D.C. 2006)).

Without the injunctive relief sought by Plaintiffs, they will be unable to

fully vindicate their rights under the FOIA. *See* Declaration of Nicole Ramos, ¶¶

25–27 ("Ramos Decl."), attached as Exhibit 4; *see also Nat'l Wildlife Federation v.*

*Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018) ("[i]rreparable

harm should be determined by reference to the purposes of the statute being

1    enforced.") (citing *Garcia v. Google*, 786 F.3d 733, 744-45 (9th Cir. 2015) (en

2    banc)). The creation of a statutory right to expedited FOIA processing "underlined

3    Congress' recognition of the value in hastening release of certain information," and

4    the loss of that right represents a cognizable harm. *Elec. Privacy Info. Ctr.*, 416 F.

5    Supp. 2d at 40 (citations omitted). If Defendants are not enjoined from withholding

6    the records that Plaintiffs seek, Plaintiffs will necessarily be harmed, because "stale

7    information is of little value." *Payne Enterprises, Inc. v. United States*, 837 F.2d

8    486, 494 (D.C. Cir. 1988).

9         Returning to the recent holding of *American Immigration Council*, the court

10   recognized the irreparable harm that is caused by not providing requested

11   information about ICE's response to COVID-19 in detention facilities. While DHS

12   suggested that there was no irreparable harm given that the pandemic is an ongoing

13   crisis without an end date in sight, the district court responded by saying "the fact

14   that the COVID-19 pandemic is an ongoing public health crisis only bolsters

15   Plaintiff's claim of irreparable harm." *American Immigration Council*, No. 20-

16   1196, slip op. at 8. In reaching this conclusion, the district court noted that the

17   plaintiff intended to use the information to influence public response and to include

18   in the ongoing conversations surrounding ICE's response to COVID-19. *Id*. In the

19   instant case, Plaintiffs similarly seek to use the requested information in order to

20   participate in ongoing conversations amongst the public and amongst policy

21

Memorandum of Points and Authorities

1  makers in order to address the handling of the COVID-19 pandemic in

2  immigration detention facilities. Ramos Decl., ¶ 27. Such conversations have a

3  direct impact on the lives of immigrant detainees and are vital to ensure

4  accountability in the treatment of those who remain detained.

5       Where the information sought by Plaintiffs relates to "ongoing public and

6  congressional debates about issues of vital national importance," as it does here,

7  irreparable harm can exist because those debates "cannot be restarted or wound

8  back." *Elec. Frontier Found. v. Office of Dir. of Nat. Intelligence*, 542 F. Supp. 2d

9  1181, 1186 (N.D. Cal. 2008) (citing *Gerstein v. CIA*, 2006 WL 3462659 at *4

10 (N.D. Cal. Nov. 29, 2006). Without a determination about – and access to – the

11 records that Plaintiffs seek through their FOIA requests, they will be unable to

12 fully participate in a "matter of current national debate." *See Washington Post v.*

13 *Dep't of Homeland Security*, 459 F. Supp. 2d 61, 75 (D.D.C  2006). The Supreme

14 Court has recognized that the FOIA, in providing a "means for citizens to know

15 what the Government is up to," serves a compelling public purpose: that it is, in a

16 sense, a "structural necessity in a real democracy." *Nat'l Archives & Records*

17 *Admin. v. Favish*, 541 U.S. 157, 171-72 (2004) (citations omitted). Without the

18 issuance of a preliminary injunction, Plaintiffs will not be able to take part in an

19 urgent national conversation – one where thousands of lives are at real and direct

20 risk.

21

**C. The Balance of Equities Tips in Plaintiffs' Favor.**

The Defendants cannot claim to be burdened by compliance with their legal

obligations, and "any complaints about the burdens of complying with [FOIA] are

best addressed to Congress, not the courts." *Elec. Frontier Found. v. Office of Dir.*

*of Nat. Intelligence*, No. C 07-5278, 2007 WL 4208311 at *7 (N.D. Cal. Nov. 27,

2007) (citation omitted). Defendants have already conceded that Plaintiffs are

entitled to expedited processing of the requests, and the injunctive relief Plaintiffs

are seeking would simply require Defendants to fulfill their responsibilities under

the FOIA statute. Such processing would neither burden other parties who have

submitted FOIA requests to the Department and its agencies, nor would it require

Defendants to deviate from Congress's intent in enacting FOIA. As discussed

*supra*, Congress specifically recognized that under FOIA, agencies must prioritize

the release of certain records. *Elec. Privacy Info. Ctr.*, 416 F. Supp. 2d at 40. The

Department's own regulations have further codified the expedited processing

scheme that Congress envisioned. *See* 6 C.F.R. § 5.5(e)(4). Because Defendants

claim that Plaintiffs' requests are, in fact, being processed in an expedited manner,

a preliminary injunction cannot be described as an undue burden. The balance of

equities tips heavily in the Plaintiffs' favor.

**D. The Public Interest Favors the Requested Relief.**

The final element of the preliminary injunction analysis weighs strongly in favor of the injunctive relief that Plaintiffs seek. Courts have recognized an "overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). The expedited release of the requested records will promote the FOIA's goal of "shed[ding] light on an agency's performance of its statutory duties." *Dep't of Justice v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749, 773, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). *See also Ctr. to Prevent Handgun Violence v. Dep't of Treasury*, 49 F. Supp. 2d 3, 5 (D.D.C. 1999) ("There is public benefit in the release of information that adds to citizens' knowledge."). When an agency's compliance with a regulation is mandated by federal law, as it is here, a court's duty to enforce it is at its "most evident." *See United States v. Caceres*, 440 U.S. 741, 749, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

The public interest inquiry is primarily intended to address an injunction's impact on non-parties rather than parties. *See Bernhardt v. Los Angeles* County, 339 F.3d 920, 931 (9th Cir. 2003) (citations omitted). In the instant matter, the public interest would certainly be promoted by Defendants' compliance with their statutory obligations, but it would also be "particularly well-served" by their "timely release" of information that has received extensive attention from the

1  media, Congress, and the general public alike. *See Electronic Privacy Info. Ctr.  v.*

2  *Dep't of Justice*, 416 F. Supp. 2d. 30, 42 (D.D.C. 2006). Congress enacted the

3  FOIA to "pierce the veil of administrative secrecy and [] open agency action to the

4  light of public scrutiny." *Animal Legal Defense Fund*, 935 F.3d  at 861 (quoting

5  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11

6  (1976). The public interest would benefit greatly from prompt and thorough

7  disclosure of the requested records.

8                                        **<u>CONCLUSION</u>**

9         For the foregoing reasons, Plaintiffs' motion for a preliminary junction

10  should be granted.

11

12

13  DATED: July 13, 2020            /s/ A. Nicole Hallett

14                                            A. Nicole Hallett (*pro hac vice*)
                                              EDWIN F. MANDEL LEGAL AID CLINIC
15                                            The University of Chicago Law School
                                              6020 S. University Ave.
16                                            Chicago, IL 60637
                                              Tel: (203) 910-1980
17                                            Fax: (773) 702-2063

18                                            Erika Pinheiro (CA Bar No. 275711)
                                              AL OTRO LADO
19                                            PO Box 32578
                                              Los Angeles, CA 90032
20                                            Tel: (619) 786-4866
                                              Fax: (323) 430-8793

21

Memorandum of Points and Authorities

Attorneys for Plaintiffs
AL OTRO LADO and
EDWIN F. MANDEL LEGAL AID CLINIC

Memorandum of Points and Authorities